NOT DESIGNATED FOR PUBLICATION

Nos. 124,873
124,874

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.L. and T.L.,
Minor Children.

MEMORANDUM OPINION

Appeal from Thomas District Court; KEVIN BERENS, judge. Opinion filed September 23, 2022. Affirmed.

*Leslie Beims*, of Goodland, for appellant natural mother; *Isaac LeBlanc*, of Brown, Creighton & Peckham, of Atwood, for appellant unknown fathers of K.L.; and *Craig L. Uhrich*, of Uhrich Law Firm P.A., of Oakley, for appellant natural father of T.L.

*Heather F. Alwin*, of Alwin Legal Services, LLC, of Colby, guardian ad litem.

*Christopher A. Rohr*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., SCHROEDER and WARNER, JJ.

PER CURIAM: This consolidated appeal arises from an order under the Revised Kansas Code for Care of Children (KCCC), K.S.A. 38-2201 et seq., terminating the parental rights of Mother as to K.L. and T.L., Father as to T.L., and unknown fathers of K.L. After a thorough review of the record, finding no error we affirm.

1

Following a report that K.L. tested positive for methamphetamine at birth in January 2020, the State petitioned to have K.L. and sibling T.L. declared children in need of care (CINC). Over the course of the next few days, the district court ordered the placement of K.L. and T.L. into the custody of the Kansas Department of Children and Families (DCF). The court appointed a guardian ad litem (GAL) and appointed separate counsel for both Mother and Father.

Based on no-contest stipulations by Mother and Father to the State's petition, the court found the children to be in need of care, ordered them to remain in DCF custody, and established a goal of reintegration with each parent.

Eight months after the court removed K.L. from Mother's care, the parties made the district court aware that a paternity dispute had arisen, specifically related to K.L. Although Father and Mother were married at the time of K.L.'s birth and Father signed the birth certificate as K.L.'s father, he now believed he may not be the biological father. The court ordered genetic testing for Father and K.L. After it was determined that Father was not the biological father of K.L., the district court appointed Isaac LeBlanc as counsel for all unknown fathers.

The last permanency hearing occurred on May 17, 2021. After hearing extensive testimony, the district court found reintegration with Mother and Father was no longer viable and entered an order stating the same. The State filed a petition to terminate the parental rights of Mother, Father, and unknown fathers (collectively parents). The petition alleged several statutory bases for finding the parents unfit, including: drug use, failure of reasonable efforts made by appropriate agencies to rehabilitate the family, a lack of effort to change their circumstances, conduct, or conditions to meet the children's needs, and a failure to carry out a reasonable plan directed toward integrating the children

2

into a parental home. The State also asked the court to apply the statutory presumption of unfitness under K.S.A. 38-2271(a)(5).

The details of the termination hearing and the reasons the district court ultimately ordered the termination of the rights of Mother, Father, and unknown fathers will be discussed as necessary below. But following the court's termination order, the parents jointly moved to alter or amend judgment, raising five separate deficiencies in the district court's decision that supported reinstating their parental rights. The district court denied parents' joint motion and parents timely appeal.

ANALYSIS

Parents' primary claim is that the evidence was insufficient to justify termination of their parental rights. But before we can reach that claim, we must resolve three preliminary matters: whether unknown fathers were denied their due process rights, whether the court erred in applying the statutory presumption under K.S.A. 38-2271(a)(5), and whether the court erred in admitting hearsay evidence at the termination hearing.

I. UNKNOWN FATHERS OF K.L. WERE NOT DENIED DUE PROCESS

Unknown fathers allege that they were not represented at the termination hearing. They contend that this is an issue of due process with an unlimited standard of review. We need to set out the facts of this claim to fully understand it.

Father and Mother were married at the time of K.L.'s birth and Father signed the birth certificate as K.L.'s father. But eight months after K.L. was born and placed in DCF custody, Father questioned K.L.'s paternity. In September 2020 the district court ordered genetic testing to determine whether Father was K.L.'s biological father. After testing

3

revealed that Father was not K.L.'s biological father, the court appointed LeBlanc to represent all unknown fathers of K.L.

A few weeks later the district court was advised that Mother had identified A.C. as a *potential* biological father for K.L. On April 26, 2021, at the request of the parties, the district court ordered a paternity test for A.C. LeBlanc was also representing A.C. in a criminal case and a separate child in need of care case before the court.

The next month, the court conducted a permanency hearing. LeBlanc appeared on behalf of unknown fathers. No unknown fathers appeared at the hearing. LeBlanc posed questions at the hearing solely to the case manager, pointing out that A.C. had not yet completed a paternity test and he was the only person identified as a possible father to K.L. During closing argument at the hearing, LeBlanc advised the court that he had notified A.C. of the allegations of his paternity and told him to be ready to submit a paternity test when he received a phone call. The court found that reintegration was no longer an option, and the State ultimately moved to find parents unfit and terminate their parental rights.

The district court entered a pretrial order in the case. In that order, LeBlanc stated on behalf of unknown fathers that jurisdiction was proper, that DCF did not set up a paternity test promptly, that he disagreed with termination of parental rights of unknown fathers in that there could be no finding of unfitness as to them, and he would call A.C. as a witness at the hearing.

The case was set for a termination hearing and then continued at request of Mother. Both times the court provided notice by publication to all unknown fathers. The termination hearing was set for October 28, 2021. On the day before the hearing, LeBlanc filed a motion for a continuance because his wife was in labor. Although rulings on continuance motions appear elsewhere in the record on appeal, there is no indication that

4

the district court ever ruled on LeBlanc's motion. Instead, on the day of the hearing, LeBlanc's law partner, Charles Peckham, appeared. The following colloquy took place:

"MR. PECKHAM:  May it please the Court, the unknown father appears by Charles A. Peckham, substituting for Isaac LeBlanc. And I believe [A.C] has been identified as the father of [K.L.].

"I have an announcement to make on that.

"THE COURT:  Okay.

"MR. PECKHAM:  Basically, Your Honor, I've not been able to confirm with [A.C] but Mr. LeBlanc had talked to him and he states that he does not want to raise the child. He believes it would be in the best interests of the child to be adopted. So basically, he would not oppose termination, and Mr. LeBlanc has sent him documentation to sign to confirm this.

"THE COURT:  Very well."

After the other parties announced their appearances, the court continued:

"THE COURT:  Very well, Thank you.

"Counsel, before we proceed, Mr. Peckham has made an announcement regarding [A.C.], the putative father in this matter. And I guess with that, does the State have any issues with the Court allowing Mr. Peckham to excuse himself, since it appears [A.C.] does not appear, and has communicated his desire to not contest this issue. And we would now have, I guess, really no reason for Mr. Peckham to stay on throughout the reminder of these proceedings.

"In addition, there being no other unknown fathers appearing, they would also be in default."

Except for Mother, all parties agreed to allow Peckham to withdraw. Mother stood mute. The GAL reiterated that paternity had not been established "in this case or in the other case" at the time of the hearing.

The court continued:

5

"THE COURT: Very well. Mr. Peckham, I appreciate your appearance this morning. We're going to go ahead and excuse you from the remainder of the proceedings, given that [A.C.] has no objection, does not appear in here today, and nor are there any other unknown fathers appearing and asserting any right in this matter.

"MR. PECKHAM: Thank you, your honor.

"THE COURT: Thank you for your appearance, you are excused."

There was no discussion regarding the lack of notice to unknown fathers or their request for a continuance. On the other hand, counsel for Father requested a continuance to allow him more time to engage with T.L. Mother joined in the request. The State and the GAL objected. The district court denied the request.

Now on appeal, unknown fathers claim:

1. Because the paternity of unknown fathers had not been established at the time of the termination hearing, Peckham should not have been dismissed from the hearing. Doing so left unknown fathers unrepresented.
2. The district court violated the due process rights of unknown fathers because LeBlanc's continuance motion was denied, thus leaving unknown fathers with inadequate counsel during the hearing. They argue that Peckham had "less than twenty-four hours to prepare" showing the unknown fathers did not have adequate counsel.

Unknown fathers' claims are confusing at best, particularly because nothing in the record indicates the district court denied LeBlanc's request for a continuance. Instead, it shows that LeBlanc's partner appeared, did not renew any request for a continuance, conveyed he was ready to proceed and shared that even though no unknown fathers appeared, LeBlanc had spoken to the one possible father, A.C., who apparently knew of

6

the hearing and wanted to state that he did not object to the termination of his rights. The record betrays counsel's claim that unknown fathers were unrepresented. LeBlanc himself had substitute counsel stand in for him.

Appellate courts generally review a district court's refusal to grant a continuance for an abuse of discretion. *In re J.A.H.*, 285 Kan. 375, 384, 172 P.3d 1 (2007). Under this highly deferential standard of review, we will not overturn a district court's discretionary decision on appeal if reasonable persons could differ about the propriety of that decision. See *Schuck v. Rural Telephone Service Co.*, 286 Kan. 19, 24, 180 P.3d 571 (2008). Here, unknown fathers cannot even establish that a continuance request was denied. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013) (finding burden is on the party making a claim to designate a record sufficient to support its claims). Although the case proceeded to hearing, the record does not reflect a denial and substitute counsel did not renew the written request. Moreover, a continuance request from Mother and Father was denied, confirming the court was not inclined to continue this case, which had been continued once before.

On appeal, counsel does not point to any action on the part of the person he sent to fill in for him which prejudiced his clients. Peckham did not state that he was not prepared, and he did not appear to be unprepared. LeBlanc does not assert that any of Peckham's statements were false or not supported by the record. He does not contend that he did not request Peckham appear for him, or that he did not fully advise Peckham of the status of the case. In sum, even if Peckham's appearance is not seen as a withdrawal of any continuance request before it was ruled on by the court, unknown fathers have failed to establish the court's denial was unreasonable.

As to their due process claim, the fundamental requirement of due process is the opportunity to be heard at a meaningful time in a meaningful manner. *State v. Hillard*, 315 Kan. 732, 758-59, 511 P.3d 883 (2022). Unknown fathers do not claim they lacked

7

notice of the proceedings. The record is clear that they were notified by publication. At the time of publication there were no known fathers, only one possible father. It was not until the termination hearing that the court became aware, through Peckham and later Wendt, that a paternity test had revealed that A.C. was K.L.'s biological father. A.C. had actual notice of the proceeding because he informed counsel that he did not object to termination of his parental rights. This would align with LeBlanc's prior statements that he had told A.C. to be ready to give a paternity test and the pretrial order showing he planned to call A.C. as a witness at the termination hearing. In addition, Peckham explained that LeBlanc would obtain documentation from A.C. verifying this. It is not known if that was ever obtained. But again, it certainly indicates recent conversations with A.C. about the case. So even if we held that the court needed to notify A.C. of the proceedings over and above the published notice to all unknown fathers—and we do not find it was since no paternity test results had been filed with the court—the record supports a finding that A.C. had actual notice and elected not to pursue his rights to his child.

And finally, when a parent fails to appear at the hearing on a motion to terminate parental rights, the State may proceed by proffering the evidence supporting the motion if there is no objection by counsel for the parent. If the parent has instructed counsel to object to a proffer, then the State must proceed by presenting evidence to the court in support of termination. K.S.A. 38-2248(f); *In re K.H.*, 56 Kan. App. 2d 1135, Syl. ¶ 3, 444 P.3d 354 (2019). Here, a full evidentiary hearing followed with witnesses establishing the bases for termination of the parental rights of Mother, Father, and unknown fathers. LeBlanc does not argue that there were any arguments that should have been made that were not because of his absence. In other words, he cannot establish prejudice under these facts, nor does he try.

Unknown fathers were fully represented during this case and received notice of the proceedings. We find any argument that they were not to be wholly unsupported by the

record. See also *State v. Willis*, 312 Kan. 127, 131, 475 P.3d 324 (2020) ("Under the invited error doctrine, a litigant may not invite error and then complain of that same error on appeal.").

## II. THE DISTRICT COURT DID NOT ERR IN APPLYING THE STATUTORY PRESUMPTION OF K.S.A. 38-2271(a)(5)

The KCCC provides for a presumption of parental unfitness if the State proves by clear and convincing evidence that

> "the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." K.S.A. 38-2271(a)(5).

Once the presumption is established, the burden shifts to the parent to rebut the presumption by a preponderance of the evidence. Failure to prove that the parent is presently fit and able to care for the child now or will be fit in the foreseeable future mandates the termination of parental rights. K.S.A. 38-2271(b).

The parties agree that K.L. and T.L. were in out-of-home placement for longer than the one-year period required by the statute. The children were removed from the parental home and placed in DCF custody on January 17, 2020—just a few days after K.L.'s birth. The termination hearing occurred on October 28, 2021—just over 21 months later. The district court found that the presumption applied. Under normal circumstances, Mother and Father would have no reasonable basis to contest that this element of the presumption had been met.

9

But here Mother and Father argue the Kansas Supreme Court's administrative orders tolling statutory deadlines or time limitations during the COVID-19 pandemic precluded applying a statutory presumption of unfitness based on the time a child is in out-of-home placement under court order. In their view, the district court erred in applying this presumption because these pandemic-related orders should have led to the one-year period of out-of-home placement from K.S.A. 38-2271(a)(5) ending in December 2021.

Mother and Father direct this court's attention to a series of administrative orders issued by the Kansas Supreme Court in connection with declarations of a state of disaster emergency by the Governor of the State of Kansas because of the COVID-19 global pandemic. In particular, our Supreme Court issued an initial order in March 2020 that suspended "[a]ll statutes of limitation and statutory time standards or deadlines applying to the conduct or processing of judicial proceedings," and extended the same several times until April 15, 2021. See Kansas Supreme Court Administrative Order 2020-PR-016, effective March 18, 2020 (initial order limiting judicial functions statewide and imposing restricted operations in judiciary proceedings); Kansas Supreme Court Administrative Order 2021-PR-020, effective March 30, 2021 (reinstating "[m]ost deadline and time limitations [on] April 15, 2021," but extending the suspensions for certain criminal and habeas proceedings).

Under K.S.A. 2021 Supp. 20-172(d)(1), the March 2021 order also provided

> "'[f]or a deadline or time limitation that was extended or suspended . . . , a person shall have the same number of days to comply with the deadline or time limitation as the person had when the deadline or time limitation was extended or suspended.'" Order 2021-PR-020.

Mother and Father argue that these administrative orders tolled the one-year period from K.S.A. 38-2271(a)(5) and the court should not have counted the time between May 1, 2020, and April 15, 2021, against them for applying the presumption. This argument is not persuasive.

First, Mother and Father did not raise this during the termination hearing as a reason for their failure to comply with court orders in a timely manner. They first raised it in a motion to alter or amend judgment filed under K.S.A. 2021 Supp. 60-259. Appellate courts routinely review issues raised for the first time in a motion to alter or amend judgment for an abuse of discretion. See *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 323, 393 P.3d 601 (2017). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

But to determine whether Mother and Father's claims are valid, we must review and interpret administrative orders issued by the Kansas Supreme Court. We exercise unlimited review when interpretating those administrative orders. See *In re Marriage of Callaghan*, 19 Kan. App. 2d 335, 335-36, 869 P.2d 240 (1994) (interpreting Kansas Child Support Guidelines issued by administrative order).

We first note that the presumption of unfitness in K.S.A. 38-2271(a)(5) is not a statutory deadline akin to a statute of limitation or a criminal defendant's right to a speedy trial. For this court to accept that characterization would mean that every parent subject to a CINC proceeding has only one year to achieve reintegration and this court has expressly rejected such an interpretation. See *In re T.H.*, 60 Kan. App. 2d 536, 557, 494 P.3d 851 (2021), *rev. denied* 314 Kan. 855 (2021) (referring to a one-year deadline as "not a legal requirement but an internal policy preference"); *In re K.R.*, 43 Kan. App. 2d 891, 905, 233 P.3d 746 (2010) ("[T]here is no fixed deadline of 1 year for reintegration,

11

as suggested by some of the witnesses here."). Rather, the KCCC directs the court to liberally construe the statute and encourages it to "dispose of all proceedings . . . *without unnecessary delay*." (Emphasis added.) K.S.A. 38-2201(b)(4).

In other words, the language in K.S.A. 38-2271(a)(5) does not establish a procedural or judicial deadline which must be met in every CINC proceeding. Instead, the statute merely authorizes a court to presume parental unfitness based on the factual circumstances of the case. Other than providing the text of the administrative orders and asserting that K.S.A. 38-2271(a)(5) represents a "time standard," Mother and Father offer nothing to support their interpretation of the orders. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (failing to support a point with pertinent authority is like failing to brief an issue). The Supreme Court's administrative orders were specifically limited to "statutes of limitation and statutory time standards or deadlines *applying to the conduct or processing of judicial proceedings*." Kansas Supreme Court Administrative Order 2020-PR-058, effective May 27, 2020. The one-year time frame from K.S.A. 38-2271(a)(5) is not a deadline that the court must adhere to in every CINC case because meeting it does not automatically trigger a termination of parental rights.

Declining to adopt Mother and Father's position also makes sense when here the district court continued holding permanency hearings over Zoom—most of which Mother and Father attended—and the parents continued working towards reintegration during the time when the suspension orders were in effect. Indeed, the court found reintegration remained viable starting from the first permanency hearing in June 2020—which was after the suspension orders began—all the way up until May 2021, after the Kansas Supreme Court lifted the suspension orders.

Furthermore, adopting Mother and Father's position would contradict an express purpose of the KCCC, specifically to "acknowledge that the time perception of a child differs from that of an adult and to dispose of all proceedings . . . without unnecessary

12

delay." K.S.A. 38-2201(b)(4). K.L. was born just two months before the COVID-19 pandemic began and has already spent her entire life in State custody. So the facts here in particular show why suspending the one-year presumption unnecessarily prolongs the goal of permanency for a child who is without adequate parental care.

In short, we find that the Kansas Supreme Court's administrative orders suspending statutory time limitations and deadlines in judicial proceedings did not apply to suspend the one-year presumption from K.S.A. 38-2271(a)(5).

III.    MOTHER AND FATHER FAIL TO PRESERVE THEIR EVIDENTIARY CLAIMS.

Mother and Father next argue the district court erred by allowing the State to present hearsay testimony at the termination hearing. Their argument is two-fold: (1) The court erred by allowing a permanency specialist, Ivy Wendt, to testify from court reports prior to her involvement in the case; and (2) that the court erred by denying a request to take judicial notice of "all Court Reports" filed in the case.

Because both claims relate to the admission of or failure to admit certain evidence, we start by noting that an appellate court is generally precluded from reviewing an evidentiary challenge absent a timely and specific objection made on the record. K.S.A. 60-404; *State v. Great Plains of Kiowa County, Inc.*, 308 Kan. 950, 953, 425 P.3d 290 (2018); see also K.S.A. 38-2249(a) ("In all proceedings under [the KCCC], the rules of evidence of the code of civil procedure shall apply[.]"). With that in mind we will address each claim of error.

A. *The testimony of case worker Wendt*

Mother and Father claim the court allowed permanency specialist Wendt to present testimony that was hearsay upon hearsay. Because she was not assigned to the

13

case for the entire period, they contend that she referred to information in reports completed by coworkers who were assigned to the case before her. There are two problems with their claim.

First, it is unclear from the record if Wendt was referring to any records other than her own at the trial. She did testify that she had reviewed all the "court reports" several months earlier. But there was no question brought to the court's attention regarding her referral to specific court files. And she was questioned by all parties about her knowledge of the case both before her assignment and after. So without more specific guidance on which portions of Wendt's testimony were allegedly hearsay, this court cannot even begin to engage in a proper analysis of whether the court improperly admitted hearsay evidence. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (issues not adequately briefed should be considered waived or abandoned); *Friedman*, 296 Kan. at 644 (party asserting error has the burden of designating a record sufficient to establish claims on appeal).

Second, and closely related to the first, Mother and Father provide no record citations to any contemporaneous objections lodged on the grounds of hearsay related to Wendt's testimony at the termination hearing. Our review of the record reveals a single hearsay objection lodged by Father's counsel during the testimony of the foster parent. The objection related to the foster parent referencing a conversation she had with someone else—not present in the courtroom. The court sustained the objection.

Thus, Mother and Father have failed to preserve any objection to hearsay admitted during Wendt's testimony due to their failure to lodge a timely and specific objection.

*B. Request for court to take judicial notice of all court reports*

Mother and Father also claim that the district court erred by declining to take judicial notice of all court reports in the case.

For clarification, the court reports in question constitute the "social file," which contains reports and evaluations from the agencies involved in the case. See K.S.A. 38-2211(a) and (b) (differentiating between the "official file" and the "social file" in CINC proceedings). But simply being part of the court's files does not automatically mean the court must rely on the facts or conclusions in the reports because the KCCC requires the reports to be properly admitted into evidence. K.S.A. 38-2249(b)(1) ("The judge presiding at all hearings under this code shall not consider or rely upon any report not properly admitted according to the rules of evidence, except as provided by K.S.A 38-2219."). K.S.A. 38-2219(e)(2) further provides that no fact or conclusion derived from a report ordered by the court "shall be used as the basis for an order of the court unless the information has been admitted into evidence following an opportunity for any party or interested party to examine, under oath, the person who prepared the report."

Rather than seeking to admit specific court reports into evidence which they believed bolstered their case, Mother and Father asked the district court, at the termination hearing, to take judicial notice of all the case reports. See K.S.A. 60-409; *In re K.H.*, 56 Kan. App. 2d at 1141 (recognizing that courts may take judicial notice of their own records). The State and the GAL objected to taking judicial notice of the records because the court had not admitted them into evidence and their accuracy could not be determined without testimony from the person who wrote each report. After taking the matter under advisement and hearing all the testimony, the court denied the request. On appeal, Mother and Father frame this is as the court allowing Wendt to testify from reports but then refusing to consider the reports themselves.

15

As already noted, Mother and Father did not contemporaneously object to Wendt's testimony. They did not mention any instances when the court prevented them from questioning Wendt about information that was in court reports but was not included in Wendt's testimony—evidence that was essential to their case. Moreover, Mother and Father did not renew their request for the court to judicially notice the court reports in their motion to alter or amend judgment. Instead, Mother and Father limited their argument in the motion to challenging the admission of Wendt's testimony. They concede that the reports they sought to admit may not be accurate and then jump to the conclusion that the court should not have allowed Wendt to testify from them. This is circular reasoning. Mother and Father made no objection to Wendt's testimony at trial. Thus, we find that Mother and Father have failed to preserve their objection to the court's failure to take judicial notice of all case reports.

IV.     THERE WAS SUFFICIENT EVIDENCE PRESENTED TO TERMINATE PARENTAL RIGHTS OF PARENTS

Parents argue the district court erred when it terminated their parental rights, asserting there was insufficient evidence to support the district court's decision.

As provided in K.S.A. 38-2269(a), a district court must find "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." When reviewing a finding of parental unfitness, this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-finder could have found the determination to be highly probable, i.e., by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting

16

evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The KCCC lists nonexclusive factors that a court must consider in determining parental unfitness. K.S.A. 38-2269(b). As long as clear and convincing evidence supports a single statutory factor, a district court's determination of unfitness will establish the grounds for termination of parental rights and be upheld on appeal. See K.S.A. 38-2269(f). In addition, as discussed above, the statute allows courts to apply a presumption of unfitness where the State proves 1 of 13 statutory presumptions by clear and convincing evidence. K.S.A. 38-2271(a).

After making a finding of unfitness, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 38-2269(g)(1). This court reviews a best-interests determination for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

Here, in its oral ruling, the district court found that the statutory presumption of K.S.A. 38-2271(a)(5) applied, and that the State had proven Mother and Father were unfit based on the statutory factors in K.S.A. 38-2269(b)(3), (b)(7), and (b)(8). The court also determined that termination would be in K.L.'s and T.L.'s best interests. Although parents contest the findings of parental unfitness, at no point in their brief do they specifically challenge the court's best-interest determinations. As a result, we will only address whether parents have shown the court's findings of unfitness are not supported by clear and convincing evidence. We will analyze each of the listed factors.

17

A. *Statutory presumption of unfitness*

The KCCC allows a court to presume a parent is unfit if the State establishes by clear and convincing evidence that a child has been outside the parental home "under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable [reintegration] plan." K.S.A. 38-2271(a)(5). Once the State establishes the presumption, the burden shifts to the parent to rebut the presumption by a preponderance of the evidence by showing that the parent is fit and able to care for the child now or will be fit in the foreseeable future. If a parent fails to rebut the presumption, the district court shall terminate their parental rights. K.S.A. 38-2271(b).

Because the parties agree that K.L. and T.L. have been in out-of-home placement since January 2020, the only element the State needed to prove is whether Mother and Father substantially neglected or willfully refused to carry out a reintegration plan. Mother and Father argue generally that the State failed to present evidence of neglect or willful refusal on their part to carry out a reintegration plan and assert that the evidence shows they had been "successfully completing nearly all of their case plan tasks." In their view, the district court erred in applying the presumption because the State failed to meet its burden of proof. Although normally it would be appropriate to separate the analysis for each parent given the vastly different evidence presented related to Mother's and Father's individual conduct throughout the case, the outcome of this issue is the same for both Mother and Father.

In support of Mother's argument, she admits that while Wendt's testimony indeed reflected compliance with many case plan tasks, the one exception was Mother's failure to remain sober. The GAL and State likewise agree that Mother's lack of sobriety was a "central" factor that severely limited her ability to care for her children or progress toward reintegration. Based on the uncontested evidence of Mother's continual drug use

18

and its pervasive effect on her failed efforts at reintegration, we find that clear and convincing evidence supports a finding that the State met its burden for the district court to apply the presumption.

As to Father, the evidence shows that he initially completed some of his case plan tasks but eventually stopped communicating with Saint Francis Ministries (SFM) case workers and stopped having visits with T.L, making it difficult to for the agencies to determine whether Father was complying with aspects of the reintegration plan. In Father's view, this lack of communication created a "lack of evidence [that] must be held against the State." Contrary to his conclusory assertion, the State's evidence that he was not adequately communicating with the agencies constitutes clear and convincing evidence that he was substantially neglecting or willfully refusing to carry out case plan tasks because there was no way for the agency to determine whether he was being compliant.

Having established that the State met its burden of showing the statutory presumption from K.S.A. 38-2271(a)(5) applied, the next step requires determining whether Mother and Father successfully rebutted the presumption. At no point in their brief do parents challenge the court's *procedural* application of the presumption—by raising a due process challenge. Their only argument is that "the evidence showed that the Parents had successfully completed nearly all of the case plan tasks and . . . the agencies were not providing sufficient support to Parents for completing the remainder of the tasks." No more detail or argument is provided regarding whether parents are fit and able to care for the children now or will be fit in the foreseeable future. They make no attempt to challenge the court's finding that termination of their parental rights would be in the best interests of the children. See K.S.A. 38-2269(g)(1). We find this one sentence conclusory statement in their brief, without more, to be insufficient to successfully rebut the presumption. As a result, we could end our analysis here and affirm the termination of

19

parents' parental rights. We will however review the other factors the court relied on in terminating parental rights.

### B. *Use of intoxicating liquors or narcotic or dangerous drugs*

A district court can terminate parental rights if the State provides clear and convincing evidence that "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 38-2269(b)(3).

To start, it bears mentioning that the quantum of evidence related to drug use here does not apply equally to Mother and Father, despite all parents combining their argument on this factor. The parties agree that Mother tested positive for methamphetamine several times throughout the case and as recently as a few weeks before the termination hearing. In contrast, Father's last positive drug test was in September 2020, but his lack of communication with case workers made it difficult to determine whether Father was still actively using drugs. Put simply, at least for Father, it cannot be said based on the evidence presented that drug use rendered him unfit as a parent because there is nothing to show that he was still actively using methamphetamine as of the termination hearing. Even so, Mother concedes that she uses methamphetamine but contends that the use of drugs alone should not be enough to terminate one's parental rights.

For support, parents cite *In re T.H.*, 60 Kan. App. 2d at 550. But as that case did not involve a determination of unfitness based on a parent's use of drugs, it is of little help here. See 60 Kan. App. 2d at 551 ("There was no evidence to dispute the fact that Father was not a regular drug user and had never used or sold drugs around T.H. There was evidence that he remained drug free since his current charge in January 2019.").

20

Parents also rely on *In re J.W.B.*, No. 123,606, 2021 WL 3469198, at \*7 (Kan. App. 2020) (unpublished opinion). While the panel in that case did recognize that use of drugs alone is not a sufficient basis for finding a parent unfit, parents overlook that the panel expressly noted that the district court below had not relied on drug use in isolation. Rather, just as in this case, the district court considered the negative effect of the Father's drug use on his completion of other aspects of the case plan. 2021 WL 3469198, at \*7. Here, there was testimony that Mother's continued drug use prevented her from reintegrating with the children and providing suitable housing. Furthermore, despite maintaining consistent and appropriate visitation, Mother's visits were still supervised because of the agency's concerns with her drug use. In other words, Mother incorrectly asserts that the district court found her unfit based on drug use alone. We find clear and convincing evidence supports the district court's inclusion of this fact as a reason to terminate Mother's parental rights based on K.S.A. 38-2269(b)(3).

### C. *Failure of reasonable efforts by agencies*

In addition, a district court can terminate parental rights if the State provides clear and convincing evidence showing on the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." K.S.A. 38-2269(b)(7). Parents' arguments on this point emphasize three facts that they contend reveal a lack of reasonable efforts by the agencies: (1) the long delay in establishing K.L.'s paternity; (2) Father was transporting the children for visits; and (3) the turnover of agency employees handling their case. Even so, they cite no authority for any of these propositions. On top of lack of legal support, parents' arguments suffer from other infirmities as well.

Starting with the delay in establishing paternity, parents fail to explain why completing this task was necessary to "rehabilitate the family" given the particular facts of this case. Although Mother and Father assert K.L.'s paternity was in dispute from the

21

beginning of the case, the official court file shows that Father did not contest paternity or request genetic testing until September 2020. The court promptly complied by issuing an order for genetic testing. Wendt testified that it normally took about a month to complete genetic testing if a child is in DCF custody. By the next permanency hearing in November 2020, both Father and K.L. had completed the testing but the results were still pending. At the next hearing in January 2021, the State asked the court to appoint counsel for K.L.'s unknown fathers.

Any impediments to reintegration with K.L. or T.L. based on the delay in establishing paternity are simply not apparent from the evidence presented in this case. For example, Mother managed to maintain consistent visitation with both children and complete various other case plan tasks, despite K.L.'s paternity being legally undetermined.

Second, parents' assertion that Father was "responsible for transporting the children for visits" lacks any important context and is barely supported by the evidence presented at trial. Although parents cite a section of the court reports—which, as discussed, were never properly admitted into evidence—Wendt did testify at the hearing that as of September 28, 2020, Father was "having unsupervised visits with [both children] Fridays [and] is responsible for transporting the kids to and from the visit." This evidence does not provide a sufficient basis to believe that the agencies failed to engage in reasonable efforts to support overturning the district court's finding of unfitness on this ground.

Lastly, parents contend that employee turnover in the agencies shows that reasonable efforts were not made throughout this case. Yet they ignore the fact that Wendt had been working on their case since January 2021, which was nearly 10 months by the time of the termination hearing. This time period certainly provided a sense of stability that should reflect positively on the efforts made by SFM to rehabilitate the

22

family. We find clear and convincing evidence supports the district court's decision to terminate parents' parental rights based on K.S.A. 38-2269(b)(7).

### D. Lack of effort on the part of parents

Lastly, a district court can terminate parental rights if the State provides clear and convincing evidence showing "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(8). On this point—as with others—Mother and Father contend the evidence shows they were successfully completing nearly all of their case plan tasks. Viewing the evidence in the light most favorable to the State, there was sufficient clear and convincing evidence to find parents unfit based on K.S.A. 38-2269(b)(8).

As to Mother, the most obvious example that she failed to adjust her circumstances, conduct, or condition is her continued drug use. Given that methamphetamine abuse was the primary reason the State took the children into custody in the first place in January 2020, it stands to reason that continuing to submit positive drug tests 21 months later demonstrates a failure to adjust circumstances. This drug use severely limited Mother's ability to see her children. Not only was Mother's drug use a concern, but Wendt also testified that Mother's decision to cohabitate with another drug user was a detriment to her chances at reintegration. Clear and convincing evidence in the form of Wendt's testimony and the drug test results supports a finding that Mother failed to adjust her circumstances, conduct, or condition to meet the needs of T.L. and K.L.

As to Father, the parties both emphasize the fact that Father's lack of communication with the social workers created an evidentiary gap on whether he was completing recent case plan tasks. In Father's view, the lack of evidence "must be held against the State," thus suggesting that the State had not sustained its burden of proof to show lack of parental efforts. In contrast, Father's lack of communication also showed he

had not been having visits with T.L. for nearly a year, since that was something SFM had requested. Clear and convincing evidence in the form of Wendt's testimony supports a finding that Father's failure to contact the social workers showed a lack of effort to adjust his circumstances, conduct, or condition to meet T.L.'s needs.

And of course, as to unknown fathers, they abandoned any claims by failing to appear at any hearings to assert their parental rights to K.L.

In short, reviewing all the evidence presented at the termination hearing in the light most favorable to the State, we find there is clear and convincing evidence supporting the district court's findings of parental unfitness. As a result, we affirm the termination of their parental rights.

Affirmed.